IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

BRIAN A. BAKER     PLAINTIFF

v.     Civil No. 10-2037

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration     DEFENDANT

**MEMORANDUM OPINION**

I.     **Factual and Procedural Background**

Plaintiff, Brian A. Baker, appeals from the decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a, respectively (collectively, "the Act").

Plaintiff protectively filed his DIB and SSI applications on March 30, 2007, alleging an *amended* disability onset date of March 30, 2007, due to spina bifida, chronic neck and back pain, depression, "blackouts," and numbness/tingling of his legs.[1] Tr. 11-50, 140. At the time of the onset date, Plaintiff was thirty-three years old with a high school education. Tr. 18,144, 146, 196, 547. He has past relevant work as a hardwood floor installer and janitor. Tr. 71, 164-171, 200.

Plaintiff's applications were denied at the initial and reconsideration levels. Tr. 74-79, 82-85. At Plaintiff's request, an administrative hearing was held on December 17, 2008. Tr. 11-51.

---

[1] At the administrative hearing, Plaintiff amended his alleged onset date from December 1, 2005, to March 30, 2007. Tr. 50.

Plaintiff was present at this hearing and represented by counsel. The ALJ rendered an unfavorable decision on June 2, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. 56-73. Subsequently, the Appeals Council denied Plaintiff's Request for Review on February 25, 2010, thus making the ALJ's decision the final decision of the Commissioner. Tr. 1-5. Plaintiff now seeks judicial review of that decision.

**II.     Medical History**

Plaintiff has a lengthy history of treatment for chronic back and neck pain. On June 12, 2007, Plaintiff saw Van Hoang, M.D., for a consultative physical evaluation. Tr. 214-220. Upon examination, Plaintiff had full range of motion in his cervical and lumbar spine, shoulders, elbows, wrists, hands, hips, knees, and ankles. Tr. 217. Dr. Hoang noted some stiffness in Plaintiff's lumbar spine, hips, and left knee. Tr. 218. He exhibited hypoactive reflexes, but no muscle weakness or atrophy was noted. Tr. 218. He had a negative Romberg's maneuver and was able to tandem walk. Tr. 218. Grip strength was normal. Tr. 218. Additionally, Plaintiff could hold a pen and write, touch his fingertips to his palm, oppose his thumb to his fingers, pick up a coin, stand and walk without assistive devices, and squat and rise from a squatting position. Tr. 218. He was unable to walk on his heels and toes due to hip pain. Tr. 218. Dr. Hoang found no evidence of edema or decreased pulse in Plaintiff's lower extremities. Tr. 219. He assessed Plaintiff with chronic back pain, chronic left knee pain of unknown etiology, and bilateral hip arthralgia. Tr. 220. He found moderate physical limitation in Plaintiff's ability to perform strenuous jobs and to walk, stand, sit, lift, and carry repetitively. Tr. 220.

On September 6, 2007, Plaintiff presented to Northwest Arkansas Neurosurgery Clinic, where he met with Amberlyn Naples, A.P.N. Tr. 232-233. Naples noted a history of low back pain

and a prior diagnosis of spina bifida. Tr. 232. Plaintiff also reported neck pain, blackouts, numbness and pain radiating down to his knees, and weakness. Tr. 232. Naples observed that Plaintiff walked with an antalgic gait. Tr. 233. Upon examination, he had normal muscle tone and strength. Tr. 233. Vibratory sensation was within normal limits, but light touch sensation was decreased in the bilateral lower feet. Tr. 233. Reflexes were equal and normal in the bilateral upper extremities and slightly decreased in the left ankle and patella. Tr. 233. Straight leg raise and Clonus tests were negative. Tr. 233. Rapid alternating movements and Romberg's exams were within normal limits. Tr. 233. Naples assessed Plaintiff with cervicalgia and lumbago, ordered magnetic resonance imaging ("MRI") of the lumbar spine, and referred Plaintiff to physical therapy. Tr. 233.

X-rays of Plaintiff's lumbar spine, taken on December 28, 2007, revealed mild grade 1 spondylolisthesis of L5/S1 possibly related to bilateral pars defects, but were otherwise unremarkable. Tr. 236-237.

On January 8, 2008, Alice M. Davidson, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC"), in which she determined Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand/walk/sit for a total of six hours in an eight-hour workday, and push/pull an unlimited amount (except as shown for lift/carry). Tr. 239-246. She determined Plaintiff could occasionally stoop and crouch and frequently climb, balance, kneel, and crawl. Tr. 241. She found no manipulative, visual, communicative, or environmental limitations. Tr. 242-243.

Plaintiff was treated at Clark Family Chiropractic Clinic from April through August 2008. Tr. 354-427. X-rays of Plaintiff's cervical spine revealed degenerative disc disease at the C5-6 levels, uncovertebral and facet arthrosis of the mid and lower cervical spine, and early encroachment

at the C5-6 level. Tr. 381-382. X-rays of Plaintiff's lumbar spine revealed facet tropism and arthrosis, degenerative disc disease at L4-5, spondylolytic spondylolisthesis at L5/S1, and mild spondylosis of the lumbar and lower thoracic spine. Tr. 381-382. Dr. Clark treated Plaintiff with adjustments, interferential current stimulation, cold laser therapy, and therapeutic exercise training. Tr. 419. As of May 22, 2008, Dr. Clark noted that Plaintiff had increased range of motion in all areas and his muscle spasms were almost gone. Tr. 360. He was also driving again and was "able to do more for himself than he ha[d] been able to do in a long time." Tr. 360, 418. Dr. Clark recommended strength exercises and increased activity. Tr. 360, 368. On June 18, 2008, Dr. Clark noted that Plaintiff had not been doing his strengthening exercises and encouraged him to increase his physical activity. Tr. 356. Plaintiff indicated that he felt his condition had improved, as he was now able to walk. Tr. 357. On July 2, 2008, Plaintiff reported having "a lot less pain all over." Tr. 410. Dr. Clark continually noted that Plaintiff's condition was improving, with the exception of two flare-ups. Tr. 408-424. On July 30, 2008, however, Dr. Clark noted that Plaintiff's prognosis was guarded and uncertain, and there was a 60% chance that he would require long-term treatment. Tr. 406.

Plaintiff was also treated at Family Chiropractic Clinic in January 2007 and again from October 2008 through May 2009. Tr. 557-568. On November 5, 2008, Plaintiff stated that he felt like he was improving. Tr. 563.

Plaintiff was treated by Lisa McGraw, M.D., for congenital spina bifida, chronic pain and "blackout spells." Tr. 231, 252-259, 438-453. On April 8, 2008, Plaintiff underwent MRI testing of his brain, lumbar spine, and cervical spine. Tr. 248-249. An MRI of Plaintiff's brain revealed inflammatory changes of the right frontal sinus region, but was otherwise normal. Tr. 248, 334. An

MRI of Plaintiff's lumbar spine revealed small disc herniations at L4-5 and L5-S1, accentuated marked lordosis at the L5-S1 level, probably developmental, mild bilateral degenerative facet joint disease with mild neural foraminal narrowing at L4-5 and L5-S1, worse on the right, and a possible right foraminal disc protrusion at L5-S1, on top of the centrally herniated disc. Tr. 249, 335. An MRI of Plaintiff's cervical spine revealed degenerative disc disease with disc herniations at C5-6 and C6-7, primarily centrally and to the left. Tr. 250, 333.

Dr. McGraw referred Plaintiff to Jon Gustafson, M.D., for his periodic blackouts. Tr. 253-259. On April 30, 2008, Plaintiff reported a history of loss of consciousness dating back to childhood. Tr. 253. He went several years without having an episode, but lost consciousness in May 2007. Tr. 253. Dr. Gustafson noted that Plaintiff's main complaint seemed to be lumbar and cervical spine pain and being denied disability. Tr. 253. Plaintiff had stopped working in 2005, when he was dismissed for frequent late arrivals. Tr. 254.

Upon examination, Plaintiff had full range of motion in his cervical spine and adequate range of motion in his lumbar spine, although he complained of pain with testing. Tr. 254. Straight leg raising was negative. Tr. 254. Strength, tone, and coordination were normal. Tr. 254. Romberg testing was negative. Tr. 254. Deep tendon reflexes were brisk at 3+. Tr. 254. Dr. Gustafson reviewed Plaintiff's MRI results and found no indications for spinal surgery. Tr. 255. He noted that there was sufficient spine disease to cause some pain, but there was no clear reason for Plaintiff's loss of consciousness. Tr. 255. A carotid doppler study and electroencephalogram ("EEG") yielded normal results. Tr. 324-326, 459-464. 482. Dr. Gustafson opined that the "full reason for occupational impairment is a little bit unclear as he had chronic spine pain and was able to work and has not been able to return to work since he was dismissed from his last job." Tr. 255.

In 2008, Randall Scott Beallis, D.O., treated Plaintiff for headaches and chronic back and neck pain. Tr. 288-339. On July 22, 2008, Plaintiff reported a history of "blackouts" and pain. Tr. 298. Dr. Beallis noted that Plaintiff was "very difficult to follow conversationally . . . and does not answer questions directly and often goes into unrelated topics and tangents with his thought processes." Tr. 298. When asked why he was seeking disability, Plaintiff could not give a direct answer. Tr. 298. Dr. Beallis recommended physical therapy and noted that Plaintiff needed a complete psychiatric evaluation. Tr. 299. Plaintiff attended one physical therapy session on July 31, 2008, but did not follow through with regular therapy. Tr. 879-884. On August 1, 2008, Plaintiff complained of epigastric pain, which Dr. Beallis attributed to a ventral hernia. Tr. 301. Plaintiff was given a prescription for Neurontin for pain management and referred to a surgeon for his hernia. Tr. 301. Darryl W. Eckes, M.D., evaluated Plaintiff and found no evidence of a hernia. Tr. 322-323. He ordered a CT of Plaintiff's abdomen, which revealed spondylolysis and grade-I spondylolisthesis at L5/S1, a small patch of opacity in the right lung base, and mild fatty liver changes, but no significant abnormalities. Tr. 323, 338, 353.

On August 5, 2008, Plaintiff complained of chronic back pain, although he had admittedly stopped taking Neurontin due to cost. Tr. 304. Upon examination, Plaintiff was tender along the paraspinal musculature from the cervical to lumbar spine. Tr. 304. He had good range of motion, however, and reflexes and strength were normal. Tr. 304. Dr. Beallis noted that Plaintiff's pain was symmetric and located in the soft tissue, which was likely attributable to fibromyalgia rather than underlying disc disease. Tr. 304. Dr. Beallis ordered an MRI of Plaintiff's thoracic spine, which revealed mild degenerative endplate changes and disc dessication at the T11-12 level, but no disc herniations or central or foraminal stenosis. Tr. 304-305, 327-329. Between August and October

2008, Dr. Beallis administered several sets of trigger point injections, which "helped tremendously." Tr. 285, 291, 308-321. On August 29, 2008, Dr. Beallis noted that Plaintiff's myofascitis was improving with the help of trigger point injections. Tr. 496.

Dr. Beallis completed an Attending Physician's Statement on August 25, 2008. Tr. 275. He indicated that Plaintiff suffered from myofascitis, which would cause "good" and "bad" days and would require him to take unscheduled work breaks. Tr. 275. Additionally, he found that Plaintiff could not use his feet for repetitive movements and could not perform simple grasping, pushing and pulling, or fine manipulation with either hand. Tr. 275. Dr. Beallis noted that Plaintiff could not work eight hours a day/forty hours a week and would need a sit/stand option, but expected marked improvement in the future. Tr. 275. After being asked for clarification, Dr. Beallis indicated that Plaintiff "has continued difficulties in activities of daily living, therefore, working, at least for the foreseeable future, is not an option." Tr. 277.

On October 23, 2008, Dr Beallis noted that Neurontin had not helped Plaintiff's pain. Tr. 288-289. He also noted that Plaintiff likely suffered from schizophrenia. Tr. 288-289. However, Plaintiff was very reluctant to seek mental health treatment or medication. Tr. 288-289.

In July and August 2008, Plaintiff was treated by Zbigniew T. Beyga, M.D., for surgical removal of a lipoma from his back. Tr. 279-283. Surgery was successful, and Dr. Beyga noted that the area was healing "quite nicely," with no signs of infection or any problems. Tr. 280. Dr. Beyga also noted that Plaintiff reported "much less strain and pulling" after excision of the lipoma, which he found was highly unlikely to contribute to Plaintiff's symptoms. Tr. 280-281. On August 18, 2008, Dr. Beyga noted that the incision site was healing slowly and it would take a few weeks for the inflammation to subside. Tr. 279.

On September 3, 2008, Plaintiff presented to St. Edward's Mercy Medical Center with complaints of faintness, racing heart, and nausea. Tr. 516-525. X-rays of Plaintiff's chest revealed hyperinflation, but no acute infiltrate or effusion. Tr. 514, 525. He was discharged with prescriptions for Lomotil and Zantac. Tr. 521. On October 31, 2008, Plaintiff presented to St. Edward's with complaints of back spasms. Tr. 341-350, 526-534. Upon examination, Plaintiff had limited range of motion in his back and neck and muscles spasms. Tr. 249. He was assessed with chronic back pain and discharged with prescriptions for Lortab and Flexeril. Tr. 346.

On September 10, 2008, Plaintiff saw Patricia J. Walz, Ph.D., for a psychological evaluation. Tr. 546-555. Plaintiff appeared depressed and had a flat affect. Tr. 550. Dr. Walz noted that he was cooperative, but had a very somatic focus. Tr. 550. Thought processes were logical and goal-oriented, but thought content was notable for fleeting thoughts of suicide and homicide. Tr. 550. Plaintiff denied receiving mental health treatment in the past. Tr. 547. He related a history of marijuana usage, and admitted smoking marijuana the morning of the evaluation. Tr. 549. He reportedly lost a job due to drug/alcohol use. Tr. 549.

Dr. Walz estimated Plaintiff's intelligence to be within the average range. Tr. 551. She diagnosed Plaintiff with depression related to a medical condition (chronic pain), severe somatoform pain disorder, possibly with psychosis, and cannabis abuse. Tr. 551. She estimated Plaintiff's Global Assessment of Functioning ("GAF") score at 45-50. Tr. 551. She noted that Plaintiff's ability to communicate and interact was impaired by his odd presentation and somatic focus. Tr. 551. However, she noted that Plaintiff had normal processing speed, adequate concentration and good persistence. Tr. 551-552. She further determined that Plaintiff was capable of performing basic tasks. Tr. 552.

In a Medical Source Statement (Mental), Dr. Walz determined that Plaintiff was markedly impaired in his ability to make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. Tr. 553-554. She found mild limitations in Plaintiff's ability to understand, remember, and carry out simple instructions, make judgments on simple work-related decisions, and understand, remember and carry out complex instructions. Tr. 553. She noted that Plaintiff's reality testing was impaired and that his marijuana usage could certainly impact his depression. Tr. 554.

On April 27, 2009, Plaintiff presented to St. Edward's with complaints of pain back and muscle spasms. Tr. 672-680. He was assessed with low back pain and given prescriptions for Valium and Percocet. Tr. 677. Plaintiff underwent an emergency appendectomy on April 28, 2009. Tr. 570-671. He tolerated the procedure well, and there were no complications. Tr. 765.

On July 22, 2009, Wallace H. Hays, a chiropractor, completed a Medical Source Statement (Physical), in which he determined Plaintiff could sit, stand, and walk for a total of one to two hours during an eight-hour workday, use both hands for simple grasping and fine manipulation, and both feet for repetitive movement, but could do no pushing and pulling. Tr. 893. He also found that Plaintiff could occasionally bend, squat, crawl, climb, reach above his head, stoop, crouch, and kneel. Tr. 893. Environmentally, he found that Plaintiff could occasionally be exposed to marked temperature changes and noise, but could not be exposed to unprotected heights, moving machinery, dust, fumes, gases, and driving automotive equipment. Tr. 893-894. Dr. Hays noted that Plaintiff would need unscheduled breaks during the day, would need to elevate his feet periodically, and would likely miss more than four workdays per month. Tr. 894.

On August 11, 2009, Dwight T. Johnson, M.D., completed an Attending Physician's Statement, in which he found that Plaintiff suffered from a central disc herniation at L4, cervical spine stenosis at C6-7 with facet degeneration, and lumbar spine degeneration.  Tr. 730.  He determined that Plaintiff would need unscheduled breaks during an eight-hour shift, would require a sit/stand option, and would miss more than four workdays per month.  Tr. 730.  He also indicated that Plaintiff was not capable of working eight hours a day/forty hours per week and would not experience marked improvement in the future.  Tr. 730.  Dr. Johnson determined Plaintiff could use both feet for repetitive movements and could perform simple grasping with both hands, but could not perform fine manipulation or repetitive pushing and pulling with either hand.  Tr. 730.

### III.     Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion."  *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)).  In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it.  *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

**IV.**     **Discussion**

    A.  ALJ's Determination

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity at any point since March 30, 2007, the alleged onset date. Tr. 61. At step two, the ALJ found that Plaintiff suffered from a back disorder and depression, which were considered severe impairments under the Act. Tr. 61. At step three, he determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 61-62. At step

four, the ALJ found that Plaintiff had the RFC to perform sedentary work, except that he could lift/carry ten pounds occasionally and less than ten pounds frequently, sit for about six hours in an eight-hour workday, stand and walk for about two hours in an eight-hour workday, frequently climb, balance, kneel and crawl, and occasionally stoop and crouch. Tr. 62-71. Additionally, the ALJ found that Plaintiff could only perform unskilled work where interpersonal contact is incidental to the work performed and there is no contact with the general public. Tr. 62-71. After eliciting vocational expert testimony, the ALJ determined there were sedentary, unskilled jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as small product machine operator, of which there are 500,000 jobs nationally and 4,000 jobs regionally, small products assembler, of which there are 140,000 jobs nationally and 3,500 jobs regionally, and escort vehicle driver, of which there are 157,000 jobs nationally and 1,000 jobs regionally. Tr. 72. Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Act, at any point from March 30, 2007, through June 2, 2009. Tr. 72-73.

On appeal, Plaintiff contends the ALJ erred by: (1) improperly dismissing his treating physician's opinion; (2) improperly determining his physical and mental limitations; and (3) discrediting his subjective complaints. *See* Pl.'s Br. 8-20. He also contends that the Appeals Council erred by dismissing his newly submitted evidence, which consisted of two Attending Physician Statements. *See* Pl.'s Br. 18-19.

### B. Treating Physician's Opinion

After considering the evidence of record, we find that substantial evidence does not support the ALJ's RFC assessment. Specifically, the ALJ failed to give adequate reasons for his dismissal of Dr. Beallis' Attending Physician's Statement.

A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a clamant's record. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2). The record must be evaluated as a whole to determine whether the treating physician's opinion should be controlling. *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21 (quoting *Prosch*, 201 F.3d at 1013). In any case, an ALJ must always "give good reasons" for the weight afforded to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

In making his determination, the ALJ dismissed the disabling RFC assessment completed by Dr. Beallis, Plaintiff's treating physician. Tr. 66-71. In doing so, the ALJ stated:

> As for the opinion evidence, the undersigned gives some weight to the psychological consultative examiner, Dr. Walz (Exhibit 25F), and the consultative examiner, Dr. Hoang (Exhibit 2F). The undersigned also gives some weight to the opinions of the claimant's various treating and consulting physicians, particularly Dr. Eckes and Dr. Beyga, as well as the opinion of the State medical expert.

Tr. 71. The ultimate issue of disability is one reserved to the Commissioner. *Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010). In assessing a claimant's RFC, the ALJ may discount conclusory medical opinions from treating physicians. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed"). In this instance, however, Dr. Beallis' assessment was not merely a conclusory medical opinion. Although Dr. Beallis noted that Plaintiff was unable to work, he also completed a detailed Attending Physician's Statement, in which he

specifically listed Plaintiff's exertional impairments and attributed them to myofasciitis and continual difficulties with activities of daily living. Tr. 275-277.

Here, not only did the ALJ fail to give "good reasons" for the weight afforded to Dr. Beallis' opinion, but he made no specific mention of Dr. Beallis' assessment when discussing the opinion evidence. Tr. 71. The ALJ particularly mentioned the fact that Dr. Beallis only saw Plaintiff on three occasions before completing his RFC assessment. Tr. 66. However, we find this reasoning insufficient considering the ALJ relied on the opinions of Dr. Davidson, a non-treating, non-examining agency consultant who did not have the benefit of the full record, and Dr. Hoang, who saw Plaintiff only on one occasion. Tr. 71. Moreover, the ALJ gave weight to Dr. Eckes and Dr. Beyga, who only saw Plaintiff on referral for specific ailments (a potential hernia and a fatty lipoma, respectively) that are unrelated to Plaintiff's overall claim for disability. Given these factors, we find the ALJ's treatment of Dr. Beallis' opinion lacking.

In this instance, Dr. Beallis was the only treating physician who completed an RFC assessment prior to the ALJ's determination.[2] As Plaintiff's primary care physician, Dr. Beallis was in the best position to assess his limitations. Thus, the ALJ should have given specific reasons for the weight afforded to Dr. Beallis' opinion. As such, we believe further development is necessary to determine the ultimate issue of Plaintiff's disability.

We find that substantial evidence does not support the ALJ's RFC assessment. Upon remand, the ALJ should reconsider the Plaintiff's RFC and give specific reasons for the weight attributed to Plaintiff's treating physicians.

---

[2] Plaintiff also submitted RFC assessments from Dr. Wallace Hays and Dr. Dwight Johnson to the Appeals Council as new evidence. Tr. 5.

**V.      Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).  This matter should be remanded to the Commissioner for reconsideration of the issue of Plaintiff's RFC, based on all relevant evidence, including medical records, opinions of treating medical personnel, and Plaintiff's description of his own limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001).

DATED this 4th day of March 2011.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE